UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAYNE PIETRUSZYNSKI,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

Defendant.

No. 14 C 2148

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Wayne Pietruszynski filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq.* The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff has filed a motion to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 976-77 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled."

*Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB[2] on January 3, 2011, alleging he became disabled on May 1, 2006 due to cervical and lumbar back problems, right knee injury, head injury, headaches, dizziness, migraines, right shoulder torn rotator cuff, and pulmonary embolism. (R. at 138, 160). The application was denied initially on April 12, 2011, and upon reconsideration on June 24, 2011. (R. at 137, 155). Plaintiff, represented by counsel, testified before Patricia Supergan, an Administrative Law Judge (ALJ), on June 27, 2012 in Orland Park, Illinois. (R. at 31-70). Ashok G. Jilhewar, M.D., a medical expert, and Mr. Sprower, a vocational expert, also appeared and testified. (*Id.*). Following the hearing, Plaintiff submitted additional medical records and requested a supplemental hearing. Plaintiff, again represented by counsel, appeared and testified at the supplemental hearing before ALJ Patricia Supergan on November 7, 2012, in Orland Park, Illinois. (R. at 71-136). The ALJ also heard testimony from Ashok Jilhewar, M.D., Leigh Ann Bluhm, a vocational expert, and Sandra Pietruszynski, Plaintiff's wife. (*Id.*).

The ALJ issued a partially favorable decision on December 7, 2012, finding Plaintiff disabled from May 1, 2006 through December 10, 2008. (R. at 12-25). The ALJ found Plaintiff has not been under a disability as defined by the Act since December 11, 2008. (*Id.*). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since May 1, 2006, the alleged onset date. (R. at 15). At step two, the ALJ found that Plaintiff had the following severe impairments: chronic pain syndrome, moderate

---

[2] Plaintiff's date last insured for DIB is December 31, 2011. (R. at 266).

obesity, degenerative disc disease of the cervical and lumbar spine, status post right rotator cuff repair, rotator cuff tear of the left shoulder, and headaches. (R. at 15). At step three, the ALJ first determined that from May 1, 2006 through December 10, 2008, Plaintiff's combined impairments medically equaled the listing 1.04(A), and concluded that Plaintiff was under a disability during that time frame. (R. at 16-17). The ALJ next determined that as of December 11, 2008, Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (R. at 18). The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that, as of December 11, 2008, Plaintiff had the residual functional capacity to perform a range of sedentary work. (R. at 19). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work. (R. at 23). At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that beginning December 11, 2008, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. at 24). Accordingly, the ALJ concluded that Plaintiff was disabled between May 1, 2006 and December 10, 2008, but was not under a disability beginning December 11, 2008. (R. at 24).

The Appeals Council denied Plaintiff's request for review on January 29, 2014. (R. at 1-6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).[4]

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

---

[4] The ALJ also engaged in the 8-step process for medical improvement. 20 CFR 404.1594(f)(4). As this is not a review of a previous determination for benefits, that process is not relevant to this claim.

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin,* 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Plaintiff worked as a warehouse operations manager from 1992-2006. (R. at 314). On May 1, 2006, Plaintiff sustained injuries after falling down stairs at work when his foot caught on a carpet runner. (R. at 436). Plaintiff was taken to Provena St. Mary's Hospital, and X-rays of the lumbar spine showed multilevel degenerative changes, an MRI of the lumbar spine showed degenerative disc disease and facet arthropathy with evidence of neural compression, X-rays of the cervical spine showed degenerative changes, especially at C4-5, and an MRI of the cervical spine showed multilevel disc bulging and a disc herniation at C2-3. Plaintiff was diagnosed with myofascial pain syndrome, and on June 20, 2006, Plaintiff was referred

to Stravros Maltezos, M.D., at Neurological Surgery, S.C. for neck, shoulder, and lower back pain. (R. at 537).

Plaintiff reported back and neck pain and engaged in physical therapy at Southwest Physical Therapy & Rehabilitation, Ltd. starting August 2007. (R. at 635-88). His pain response was high and his activities were very limited. Plaintiff continued to engage in physical therapy two to three times per week through October 2008, but was limited due to complaints of low back and cervical pain and walking with an antalgic gait. He had tried some walking at home but could only tolerate up to five minutes before he had to sit down and the pain worsened. (R. at 635-38). On July 27, 2007, Plaintiff had surgery for a right rotator cuff tear, and subsequently developed a pulmonary embolism.[5] (R. at 554-65).

On May 13, 2008, Plaintiff saw Michael R. Zindrick, M.D., at Hinsdale Orthopedics who noted ongoing symptoms with low back pain, bilateral buttock pain, pain in the left leg ranging from 5-10 on the pain scale, waking up at night with pain, and weakness in the left leg. Plaintiff reported cervical pain at 3-10 on the pain scale, with a headache; physical therapy was not helping, but he did get 12-14 months of relief with injections to his lumbar spine. (R. at 762). Physical examination indicated Plaintiff ambulates with a limp, is able to toe walk and heel walk, has no gross motor weaknesses, and has full range of motion of his hips. (R. at 763). Dr. Zindrick recommended a neurology consult in light of the ongoing headaches, and further conservative care such as epidural steroid injections for the neck and low

---

[5] Pulmonary embolism is a blockage in one of the pulmonary arteries in the lungs. http://www.mayoclinic.org/diseases-conditions/pulmonary-embolism/basics/definition/con-20022849.

back pain. (R. at 764). On October 14, 2008, Michael Liston, M.D., at Southside Orthopedics, P.C., Plaintiff's treating physician since December 2006, noted that he could not release Plaintiff to work "because of the bad pain in his neck and back. Until that gets resolved, he cannot work." (R. at 633, 648).

On December 11, 2008, Sean Salehi, M.D., a neurosurgeon at Neurological Surgery and Spine Surgery, S.C., conducted an evaluation. (R. at 626-30). Plaintiff indicated the whole right side of his back flares up with pain, and he has headaches. He stopped going to physical therapy because every time he does his back "swells up." (R. at 626). Injections initially helped, but Plaintiff's insurance won't cover any more injections. (*Id.*). The pain goes up to 10/10 at times. He tries to do home exercises, but states that it aggravates his pain; he has been walking for exercise. (*Id.*). Bending and standing make the pain worse, while lying down alleviates the pain in both the neck and lower back. (R. at 626). Dr. Salehi diagnosed myofascial pain syndrome, and stated Plaintiff could return to a medium capacity level of work. (R. at 630).

On February 5, 2009, Plaintiff had a Functional Capabilities Assessment (FCA) at Athletic & Therapeutic Institute (ATI) Physical Therapy. (R. at 754-61). Notes indicate he demonstrated functional capabilities at the sedentary-light physical demand level, meaning he could occasionally lift 10-15 pounds, with frequent lifting of less than 10 pounds. During the assessment, he had "numerous subjective pain reports/behaviors, regarding his low back and neck." (R. at 754). Plaintiff reported pain through the assessment, including when lifting, pushing and pulling, carrying, and squatting. (R. at 756-58).

On March 18, 2011, Kimberly Middleton, M.D., conducted a consultative examination at the request of the Agency. (R. at 704-11). Plaintiff complained of neck and back pain, pulmonary embolism, migraine headaches, and dyspnea. (R. at 704). He had been referred to an orthopedic surgeon who recommended epidural injections, but after receiving three injections his insurance declined further coverage. (*Id*.). He reported that pain radiates to his left leg and toe, it is sharp, stabbing, and moderate in intensity; his legs "go out" when the pain is intense; he no longer cooks due to his inability to bend forward; he is unable to walk more than one block and has difficulty getting up and down from a chair; he can sit and stand for only 30 minutes before experiencing pain; and his sleep is interrupted due to pain and he cannot sleep on his left side. (R. at 704-05). Dr. Middleton's physical exam revealed positive straight leg raises in the supine and seated positions, positive tenderness and swelling over the right rotator cuff, and decreased range of motion of the cervical spine, lumbar spine and bilateral hip. (R. at 706). She noted that he was able to climb onto and off the exam table without difficulty and he had a normal gait without the use of an accessory device. (R. at 707). Dr. Middleton diagnosed cervicalgia, lumbago, LE radiculopathy, rotator cuff pathology, likely tendinosis, degenerative joint disease, herniated disc, and spondylolisthesis. (*Id*.). She assessed Plaintiff "is limited with frequent and repetitive overhead reaching, pulling, pushing, heavy lifting, ambulating, twisting and bending." (*Id*.).

On May 3, 2011, Plaintiff met with Christopher Udovich, M.D., at Hedges Clinic Services Corp. for back and neck pain. Dr. Udovich assessed cervicalgia, generalized osteoarthrosis, and unspecified backache, and started Plaintiff on Flexeril and Di-

clofenac Sodium. (R. at 748). On June 7, 2011, Plaintiff complained of neck and back pain, left shoulder pain, and medication not helping with the pain. (R. at 742). Dr. Udovich referred him to Donald Roland, M.D., at Pain Treatment Centers of Illinois, LLC, for pain management. (R. at 743). On July 12, 2011, Plaintiff saw Dr. Roland who noted Plaintiff had pain on the right side of the entire back, neck pain with headaches, shoulder pain, and sciatic pain down the left leg. (R. at 717). Plaintiff described the pain as constant, shooting, tingling, pins and needles, weakness, sharp, aching, burning and throbbing, and 6-10/10 on the pain scale. (*Id.*). Plaintiff described the pain as worsening. (*Id.*). Physical examination revealed a slow gait with limp, unable to heel or toe walk, limited range of motion in the back and neck, and low back pain. (R. at 718). On July 20, 2011, an MRI of the lumbar spine revealed degenerative changes, most significant at L5-S1, and a diffuse disc bulge with superimposed central disc protrusion; an MRI of the cervical spine revealed disc protrusion at C5-C6 with mild moderate spinal canal stenosis and flattening of the cord, and mild degenerative changes; and an MRI of the thoracic spine revealed mild disc bulges from T4-T5 through T6-T7 causing mild thecal sac effacement. (R. at 780-84). On August 16, 2011, Plaintiff followed-up with Dr. Roland and presented with low back pain on both sides, radiating to the left arm, left leg, and neck, described as shooting, constant, and ongoing, with 7/10 on the pain scale. Notes indicate the frequency of episodes were daily and increasing. (R. at 728).

On August 30, 2011, Plaintiff followed-up with Dr. Udovich for pain treatment and indicated he did not want surgery or shots. (R. at 740). Dr. Udovich assessed cervicalgia and unspecified backache, and referred him to a chiropractor for neck

and low back pain. (R. at 741). On February 10, 2012, Plaintiff saw Dr. Udovich for migraine headaches and was started on Nortriptyline and Flexeril. (R. at 738-39).

On May 7, 2012, Plaintiff met with Dr. Udovich and reported falling due to severe pain in his left leg; he hurt his left arm, shoulder and mid-back on the left side, and medication was not helping. (R. at 735). He was unable to lift his left shoulder and reported headaches from his neck radiating to the scalp. (R. at 735). Plaintiff had a May 15, 2012 follow-up and reported continued headaches, and shoulder and neck pain. (R. at 732). Examination revealed left shoulder pain, sprain and strain unspecified on the wrist, and headaches. Plaintiff was referred to an orthopedic surgeon for left shoulder pain and left wrist sprain. (R. at 733).

On June 8, 2012, Plaintiff saw William Farrell, M.D., an orthopedic surgeon, for left shoulder pain after falling and injuring his left shoulder in May 2012. (R. at 777). He was diagnosed as having a small, full thickness rotator cuff tendon tear on his left shoulder. (*Id.*). Notes indicate Plaintiff "is very reticent to have surgery at this point" and therefore a conservative approach was recommended. (*Id.*). At a follow-up with Dr. Farrell on July 20, 2012, notes indicate he attended physical therapy and improved to some degree, but still had pain in the left shoulder and a restricted range of motion. (R. at 778). Dr. Farrell noted adhesive capsulitis to the shoulder and recommended manipulation under anesthesia. (R. at 778).

On October 4, 2012, Plaintiff complained of migraine headaches, neck and sciatica pain, and lower right back pain; he noted medication was not helping. (R. at 789). Dr. Udovich assessed generalized osteoarthrosis, cervicalgia, headache, backache, and thoracic back pain. (R. at 790).

**Ashok Jilhewar, M.D., Medical Expert**

Ashok Jilhewar, M.D., an internist, testified at the hearing on June 27, 2012, and noted chronic pain syndrome diagnosed as myofascial pain syndrome by treating neurosurgeons. (R. at 46, 66). Dr. Jilhewar found that from May 1, 2006 through December 10, 2008, Plaintiff met the listing of 1.04(A). (R. at 54). Although there is no medical record of any radiculopathy, Dr. Jilhewar noted the severity of the pain, abnormalities of the gait, and doctors' visits to the neurosurgeon on a continuous basis and physical therapy for a prolonged period. (R. at 54-55). At the hearing, Dr. Jilhewar did not have treatment records for 2008-2011. (R. at 61-62). The ALJ adjourned the hearing pending supplementation of the record. (R. at 67).

At a second hearing on November 7, 2012, Dr. Jilhewar testified as to the period from December 10, 2008, through the present. (R. at 101). He found Plaintiff's impairments no longer met or equaled the listing 1.04(A) because there was no documentation of neurological abnormalities or intensity of the pain management. (R. at 107-08). He also noted the Functional Capacity Assessment dated February 5, 2009, which indicated sedentary capacity with additional limitations. (R. at 102, 754-61). Based on the consultative examination with Dr. Middleton from March 18, 2011, Dr. Jilhewar opined Plaintiff could not do overhead reaching with his non-dominant left shoulder superimposed on a sedentary capacity and with the right dominant side he could only do frequent overhead reaching. (R. at 108).

**Plaintiff's Testimony**

At the first hearing on June 27, 2012, Plaintiff testified that he could not work due to the pain caused by the May 2006 accident. (R. at 36). He constantly has pain

every day and it is debilitating. (R. at 36). The daily pain is a 4-5 on the pain scale, and 3-4 times a week the pain goes to an 8 or 9, or he gets migraine headaches or sciatica causing him to injure himself, for instance by falling. (R. at 36). After one fall, he tore his left rotator cuff and was treated at the emergency room. (R. at 37). He noted his left rotator cuff is being treated conservatively by Dr. Liston who recommended physical therapy to ease the pain. (R. at 39). He has had a cane for the past 4 years. He uses it 80% of the time. (R. at 40). He tries to help his wife with cleaning, but can only dust for 10-15 minutes before having to rest. He places ice packs on his back because of the swelling on his right side. (R. at 41). He doesn't drive due to difficulties turning his neck, and the medication side effects, such as dizziness and sleepiness. (R. at 41). He can use the computer for 15-20 minutes before getting a stiff neck and blurry vision. (R. at 42). After his last surgery he developed a pulmonary embolism, leaving him fearful about having more surgeries. (R. at 42).

At the November 7, 2012 supplemental hearing, Plaintiff testified he had worsened since June 2012. (R. at 76). He fell when he lost feeling in his legs and collapsed, falling on his right knee. (R. at 77). Plaintiff has had difficulty getting treatment due to insurance. (R. at 80). Plaintiff testified that his wife helps him with bathing. His pain on this day was a 4-5 on the pain scale but on average his pain gets as high as 8-10; the pain from his lower back through his lower body can make him collapse; he cannot sleep through the night and he wakes up every two hours because of the pain; he is tired during the day and naps every couple of hours; and he has muscle weakness. (R. at 85-88). He is fearful of surgery because after his

last surgery he developed a pulmonary embolism and was in intensive care for a week. (R. at 88). He cannot sit in a chair for any length of time because his right side swells up. (R. at 89). Side effects from medication such as Gabapentin include tiredness and dizziness. (R. at 89). Plaintiff stated "I'm never pain free." (R. at 91).

Sandy Pietruszynski, Plaintiff's wife, testified at the hearing and noted Plaintiff had difficulty getting on and off the examining table when he saw the DDS doctor. (R. at 92-93). She stated that Plaintiff is in pain all of the time which makes him irritable, crabby, and hard to be around; he has a lot of migraines; she has to do all the yard work and dishes; and he drops things frequently because he loses feeling in his hand. (R. at 93-96). She has to wash him and his hair because he cannot lift his hands above his head; his condition is getting worse and Plaintiff is getting weaker and having more falls; and his headaches are more frequent and he drops things more often. (R. at 98).

## V. DISCUSSION

### A. Substantial evidence does not support the ALJ's symptom evaluation determination.

Plaintiff contends that the ALJ erred in discounting Plaintiff's testimony about the nature and extent of his pain beginning December 11, 2008. While the Court will rely on the new SSR 16-3p, the Court is also bound by case law concerning former SSR 96-7p and its "credibility" analysis.[6] The regulations describe a two-step

---

[6] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements,"

process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see* also 20 C.F.R. § 404.1529. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities [. . .]." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about her

---

the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

The Social Security Administration recently updated its guidance on evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-83 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). Here, the new SSR specifies that its elimination of the term "credibility" in subjective symptom evaluation is intended to "clarify" its application of existing rules and to "more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p, 2016 WL 1119029 at *1. Moreover, the two Social Security Rulings are not patently inconsistent. Indeed, a comparison of the two reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms. *Compare* SSR 16-3p with SSR 96-7p. Therefore, it is appropriate to evaluate [Plaintiff's credibility argument/the ALJ's evaluation of Plaintiff's subjective complaints] in light of the new guidance the Administration has provided.

symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support the claimant. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, and former SSR 96-7p, require the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted). The Court will uphold an ALJ's evaluation of symptoms if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 940.

## 1. The ALJ Impermissibly Disregarded Plaintiff's Pain Testimony

First, after finding that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms" . . . the ALJ determined that "[t]here is little support in the medical evidence for the claimant's allegations as to the nature and extent of his work-related limitations. Stated simply,

the claimant's alleged symptoms and complaints are not supported by objective findings. Absent such objective findings, the claimant's testimony, his wife's testimony and any prior allegations are not enough to support a finding of disability." (R. at 19).

An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562. Lack of objective evidence to fully support allegations of pain is not a legitimate basis for rejecting a claimant's credibility. *See Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's administrative law judges . . . of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses–the kind of injuries and illnesses revealed by x-rays."); *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain but only the applicant's or some other witness's say so"). Moreover, in this case there is ample objective medical evidence of pain, which the ALJ disregards. As extensively enumerated above, Plaintiff was diagnosed with ailments affecting his neck, shoulder, and back, and pain symptoms were reported to various physicians throughout years of treatment beginning December 11, 2008. *See, e.g.,* (R. at 626) (December 11, 2008 examination by Dr. Salehi noting "last night his neck pain was the worst. The pain goes up to a 10/10 in the low back at times."); (R. at 754) (February 5, 2009: Plaintiff had "numerous subjective pain reports/behaviors, regarding his low back and neck"); (R. at 704-05) (March 18, 2011: Plaintiff reported pain radiates to his left leg

and toe, it is sharp, stabbing, and moderate in intensity; his legs "go out" when the pain is intense; he no longer cooks due to his inability to bend forward; he is unable to walk more than one block and has difficulty getting up and down from a chair; he can sit and stand for only 30 minutes before experiencing pain; and his sleep is interrupted due to pain and he cannot sleep on his left side); (R. at 742) (June 7, 2011: Plaintiff complained of neck and back pain, left shoulder pain, and medication not helping with the pain); (R. at 717) (July 12, 2011: Plaintiff described the pain as constant, shooting, tingling, pins and needles, weakness, sharp, aching, burning and throbbing, and 6-10/10 on the pain scale).

Second, the ALJ found that the medical records show "less frequent treatment" for Plaintiff's lower back and neck impairments and chronic pain syndrome beginning December 11, 2008, and since February 2009, "there is little evidence of significant treatment or reports of pain until 2011." (R. at 19-20). The ALJ also noted that when Plaintiff saw his neurosurgeon on December 11, 2008, he reported that he had stopped attending physical therapy for his back, he was taking over-the-counter medication for his pain, and he had been walking for exercise. (R. at 20).

An ALJ must first explore the claimant's possible reasons for the lack of medical care before drawing a negative inference. SSR 16-3p. For instance, "possible reasons" an individual may not have pursued treatment include: "[a]n individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau"; "[a]n individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms"; or a

"medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual." *Id.* at *9. An ALJ may not simply rely on a lack of treatment to find Plaintiff's allegations incredible. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

Here, the ALJ ignores "possible reasons" for Plaintiff's changes in treatment, including that physical therapy exacerbated his symptoms, the pain medication was not alleviating his pain, his insurance would not support Epidural Steroid Injections (ESI), and he tried to walk for exercise because home exercises aggravated his pain. Specifically, during the December 11, 2008 examination, Dr. Salehi noted Plaintiff "has continued to attempt physical therapy for the back but he states that every time he tries to start a program it 'swells up' his back." (R. at 626). The ALJ appears to use Plaintiff's stopping physical therapy as a reason to find that Plaintiff is "improving," yet the notes indicate that physical therapy was exacerbating his pain. This is not unexpected, considering a May 13, 2008 assessment by Dr. Zindrick indicating physical therapy was not helping (R. at 762), a September 9, 2008 report from the physical therapist noting Plaintiff "presents with a very irritable lumbar derangement" and "due to his irritability he may or may not benefit from therapy" (R. at 638), and on October 17, 2008, Dr. Liston noted that Plaintiff's "neck and back problems got in the way of his [shoulder] rehabilitation . . . He does continue to have extreme disability because of the problem in his neck and upper and lower back." (R. at 631).

The ALJ also relied on the fact that Plaintiff "has been just walking for exercise," but ignores evidence from the December 11, 2008 examination that Plaintiff is unable to do home exercises (R. at 626) and the March 18, 2011 examination stating "[h]e is unable to walk greater than one block and has difficulty getting up and down from a chair." (R. at 704). Moreover, the ALJ notes that Plaintiff was only taking "over the counter" medication, but ignores evidence that other medications did not alleviate his pain symptoms or that his insurance would no longer cover certain treatments. *See* (R. at 789) (Dr. Udovich noting at an October 4, 2012 follow-up that medication was not helping); (R. at 626) (Dr. Salehi stating at the December 11, 2008 examination that "ESI in the lower back [] brought his pain level down . . . he has been denied any more injections. [ . . .] He takes OTC Ibuprofen at times for the pain . . . which helps to some degree."). The ALJ failed to explore these possible reasons for Plaintiff receiving "less frequent treatment" and not following-up with medical care between February 2009 and March 2011 before improperly drawing a negative inference in her symptom evaluation.

Third, the ALJ relies on various medical records in an effort to show that Plaintiff's condition improved after December 10, 2008. However, throughout her analysis she omits evidence of both Plaintiff's complaints of pain, and the physicians' assessments of pain. For instance, the ALJ relies on the February 2009 FCA that "showed that the claimant is able to perform work activities consistent with the above residual functional capacity" and "occasionally lift 15 pounds, frequently lift less than 10 pounds, sit for 5 to 6 hours, stand for 3 to 4 hours, and walk for 2 to 3

hours." (R. at 19-20, 754-61). Yet, the FCA also states: "It should be noted that the client had numerous subjective pain reports/behaviors, regarding his low back and neck throughout this assessment." (R. at 754). The ALJ's omissions of entire lines of evidence describing Plaintiff's ongoing problems with his back and neck pain constitute error. While an ALJ need not discuss or give great weight to every piece of evidence in the record, "[s]he must confront the evidence that does not support [her] conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474.

Similarly, the ALJ points to the March 2011 consultative evaluation and notes that the "claimant's gait was normal, and he was able to climb on and off the exam table without difficulty." (R. at 20). Again, the ALJ completely ignores Plaintiff's wife's testimony that he struggled to get off the exam table during that doctor's visit. (R. at 92-93). An ALJ may not adversely assess a claimant's credibility based on "the ALJ's own spin on the medical record" or by taking a "sound-bite" approach in evaluating the record. *Czarnecki v. Colvin*, 595 Fed. Appx. 635, 644 (7th Cir. 2015). The ALJ goes on to note several of Plaintiff's continued ailments, reports of pain, and treatment, but concludes that she has "accommodated these impairments and associated symptoms by limiting the claimant to work at the sedentary exertional level with additional limitations." (R. at 21). Because the ALJ improperly evaluated Plaintiff's symptoms, the ALJ has failed to articulate how these series of ailments and continuous reports of pain were accommodated.

Moreover, the ALJ states that "notes [after December 11, 2008] do not show worsening of the claimant's condition." (R. at 19). In so finding, the ALJ does not

address the July 12, 2011 report where Plaintiff saw Dr. Roland for pain treatment and described the pain as worsening: the pain was "constant, shooting, tingling, pins and needles, weakness, sharp, aching, burning and throbbing" and 6-10/10 on the pain scale. (R. at 717). Nor does the ALJ address Plaintiff's testimony at the supplemental hearing where Plaintiff noted he had gotten worse since June 2012. (R. at 76). Sandy Pietruszynski, Plaintiff's wife, also testified his condition is getting worse, he is getting weaker and having more falls, his headaches are more frequent, and he drops things more often. (R. at 98). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ's failure here to evaluate the evidence that potentially supported Plaintiff's claim "does not provide much assurance that [s]he adequately considered his case." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence.

## 2. Reports of Daily Activities

Plaintiff testified that he needs help putting on his shoes and bathing; he does not do any housework or yard work; he has difficulty dressing himself, opening car doors and opening jars; he sleeps downstairs in a recliner; and he must use a railing

to climb stairs in his house or get help from his wife or children. (R. at 22). The ALJ disregarded these reports because "such extensive limitations to the claimant's daily activities are not supported by the medical evidence and cannot be independently verified. As such, I cannot full[y] credit the testimony of the claimant and his wife regarding the claimant's daily activities." (*Id.*).

The ALJ cannot discount Plaintiff's credibility merely because his asserted daily activities cannot be independently verified. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("Whatever uncertainty may exist around such self-reports is not by itself reason to discount them—otherwise, why ask in the first place?—and the relevant regulations specifically allow ALJs to consider claimants' 'daily activities.'") (citing 20 C.F.R. §§ 404.1529(a), 416.929(a)); *see also Buechele v. Colvin*, No. 11 C 4348, 2013 WL 1200611, at *17 (N.D. Ill. Mar. 25, 2013) ("A claimant's statements about his own limitations, however, are naturally subjective, hence the need for the ALJ to make a credibility determination."); SSR 16-3, at *5 ("[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."). "By the ALJ's reasoning, the agency could ignore applicants' claims of severe pain simply because such subjective states are impossible to verify with complete certainty, yet the law is to the contrary." *Beardsley*, 758 F.3d at 837. In any event, the ALJ's analysis is nonsensical. The ALJ's finding that Plaintiff's "activities are not supported by the medical evidence and cannot be independently verified" ignores the fact that Plain-

tiff's wife reported that he: needs help dressing and bathing, does not do any household chores, has numerous limitations including lifting, standing, reaching, and walking, drops and breaks things, needs assistance climbing the stairs in their home, and needs help getting in and out of the shower as well as washing his hair. (R. at 333-43); *see Thomas v. Colvin*, 534 Fed. Appx. 546, 551 (7th Cir. 2013) (described the ALJ's justification as "nonsensical" given that there was corroborating evidence in the record); *Shelley v. Colvin*, No. 13 C 1239, 2014 WL 1653079, at *6 (S.D. Ind. Apr. 23, 2014) ("Shelley's wife's corroborating testimony makes this case nearly identical to *Thomas* and undermines the ALJ's first reason for discounting Mr. Shelley's testimony").

In the same vein, the ALJ impermissibly disregards the third-party function report and testimony provided by Plaintiff's wife, Sandra Pietruszynski, stating "Mrs. Pietruszynski's statements regarding the claimant's daily activities are not supported by the medial evidence." (R. at 23). The ALJ must reevaluate both of these findings on remand.

## B. Summary

Because the Court is remanding on the symptom evaluation issues, the Court chooses not to address Plaintiff's remaining arguments. On remand, the ALJ shall reevaluate Plaintiff's symptoms in accordance with SSR 16-3p, taking into account the full range of medical evidence. The ALJ shall then reassess Plaintiff's physical impairments, and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with appli-

cable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Pietruszynski's motion to reverse the ALJ's decision and remand for additional proceedings [22] is **GRANTED**. Defendant's Motion for Summary Judgment [27] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: April 14, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge